## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LATONYA WILEY,            )
                               )     **CIVIL ACTION FILE NO.**
    Plaintiff,          )
                               )
                               )     **JURY TRIAL DEMANDED**
                               )
    v.                       )
                               )
THE BOARD OF ETHICS OF     )
DEKALB COUNTY, DEKALB COUNTY, )
GEORGIA, LONNIE EDWARDS, SR.,  )
individually, and DAVID MOSKOWITZ, )
individually,               )
                               )
    Defendants.         )

## COMPLAINT FOR DAMAGES

Plaintiff LaTonya Wiley ("Plaintiff" or "Ms. Wiley") submits the following Complaint against The Board of Ethics of DeKalb County (the "Board" or "Ethics Board"), DeKalb County, Georgia (the "County" or "DeKalb County"), former Board of Ethics Chairman Lonnie Edwards, Sr., in his individual capacity, and Board of Ethics Vice-Chairman David Moskowitz, in his individual capacity.

1

## INTRODUCTION

1.      This action concerns the discrimination, disparate treatment, and retaliation against Plaintiff LaTonya Wiley, a highly qualified and seasoned attorney who endured years of racist comments and racial bias by her former supervisor and Ethics Officer, Stacey Kalberman in her service as the Deputy Ethics Officer for DeKalb County and its Ethics Board. Defendants DeKalb County and its Board of Ethics removed Ms. Wiley from employment in retaliation after she engaged in legally protected activity of complaining about race discrimination and retaliation internally and to the U.S. Equal Employment Opportunity Commission.  Defendants initially failed to conduct any kind of investigation and berated Ms. Wiley when she sought assistance in moving her concerns forward. Once Defendants decided to conduct an investigation, more than six months after the initial complaint, they placed Ms. Wiley—the grievant—on administrative leave, which was neither necessary nor warranted since she was not the accused. Months later, Defendants conducted a sham investigation into Ms. Wiley's allegations that did not meet industry standards. Defendants never returned Ms. Wiley to work even after the investigation concluded, and, in fact, terminated her four months later under the pretext that her position was not lawfully authorized and "did not exist"—a rationale that never arose before she engaged in protected activity.

2

2.     Ms. Wiley brings this action against Defendants for race discrimination, disparate treatment, and retaliation in violation of 42 U.S.C. § 1981, as well as retaliation under the Georgia Whistleblower Act ("GWA"), O.C.G.A. § 45-1-4, *et seq*.  Ms. Wiley seeks injunctive and declaratory relief, back pay, and lost benefits, front pay or reinstatement, compensatory damages, and attorney's fees and costs of litigation to remedy these state and federal law violations.[1] Plaintiff also seeks punitive damages for the violation of her federal rights under 42 U.S.C. § 1981 from the individual Defendants.

## JURISDICTION AND VENUE

3.     Ms. Wiley's claims under 42 U.S.C. § 1981 present federal questions over which the Court has jurisdiction under 28 U.S.C. § 1331.

4.     Venue is proper under 28 U.S.C. § 1391(b) and (c), as a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Atlanta Division of the United States District Court for the Northern District of Georgia.

---

[1] Ms. Wiley timely filed formal Charges of race discrimination and retaliation against the Board (Charge No. 410-2022-06069) and the County (Charge No. 410-2022-08050) (collectively, the "Charges"), respectively, with the U.S. Equal Employment Opportunity Commission ("EEOC"). Those Charges remain pending. She intends to seek leave to amend this Complaint upon receipt of the notices of right to sue from the EEOC for her Title VII claims.

5.     This Court has supplemental jurisdiction over Ms. Wiley's state law claim arising under O.C.G.A. § 45-1-4, *et seq*., pursuant to 28 U.S.C. § 1367.

## PARTIES

6.     Ms. Wiley is a resident of Fulton County, Georgia and submits herself to the jurisdiction of this Court.

7.     Defendant Board of Ethics of DeKalb County is subject to the jurisdiction of this Court and may be served with process via personal service upon its Chair, Alexandra Joseph, at 178 Sams Street, Decatur, Georgia 30030.

8.     Defendant DeKalb County, Georgia is subject to the jurisdiction of this Court and may be served with process upon its CEO, DeKalb County Chief Executive Officer Michael L. Thurmond, 1300 Commerce Drive, 6th Floor, Decatur, Georgia 30030.

9.     Defendant Lonnie Edwards is the former Chair of the Board of Ethics and subject to the jurisdiction of this court. Defendant Edwards may be personally served at his residential address.

10.     Defendant David Moskowitz is the Vice-Chair of the Board of Ethics and subject to the jurisdiction of this court. Defendant Moskowitz may be personally served at his residential address.

11.    Defendants DeKalb County and Board of Ethics function as a single employer for purposes of their employment relationship with the staff members in the Ethics Department, including Ms. Wiley.

12.    Alternatively, Defendants DeKalb County and Board of Ethics are a joint employer of staff members in the Ethics Department, including Ms. Wiley; or have an agency relationship with respect to their employment relationship with such staff members.

13.    During the term of her employment for Defendants Ethics Board and DeKalb County, Plaintiff and the entity Defendants were parties to an employment agreement consistent with 42 U.S.C. § 1981, under which Plaintiff performed work for Defendants and Defendants compensated her for the performance of work.

14.    At all times relevant hereto, Defendants Edwards and Moskowitz were agents or employees of the entity Defendants who, while serving in a managerial capacity, acted with malice and/or reckless indifference to Ms. Wiley's federally protected rights.

## FACTUAL BACKGROUND

### *Defendant DeKalb County Board of Ethics and its Relationship to Defendant DeKalb County*

15.    Defendant DeKalb County, Georgia is a political subdivision of the state of Georgia. Pursuant to its Organizational Act, as duly ratified by DeKalb

citizens, the County operates under a seven-member elected Board of Commissioners and a separately elected, full-time Chief Executive Officer. (Collectively, "DeKalb's governing authority").

16.     In 1990, DeKalb County citizens ratified an amendment to the County's Organizational Act to create a *Code of Ethics* applicable to the County's governing authority.

17.     A seven-member appointed *Board of Ethics* was established to enforce the Code of Ethics.  The Board of Ethics was legislatively authorized to "hire its own staff and clerical personnel." See Ga. L. 1990, p. 3900. ("1990 Ethics legislation").

18.     In 2015, DeKalb citizens, again, amended the County's Organizational Act and voted to drastically expand the jurisdiction of the Code of Ethics. The Code of Ethics would now apply not only to DeKalb's (8-person) governing authority, but also all County employees, appointed officials and private citizens doing business with DeKalb County (well over 5,000 persons). See Ga. L. 2015, p.3811. ("2015 Ethics legislation").

19.     To account for this expanded jurisdiction, the 2015 Ethics legislation created the position of full-time Ethics Officer, implemented a fully funded Ethics Office, and increased the Ethics Board's general hiring capacity (the Ethics Board "shall be authorized to employ its own staff and clerical personnel *and* contract for

the services of a competent court reporter, and attorney, and a private investigator as it deems necessary."). *Id.*

20.     The 2015 Ethics legislation did not grant the Board of Ethics unilateral authority to hire the Ethics Officer. It could only nominate a person for this position and then gain approval and confirmation of DeKalb's governing authority before a final hiring decision is made.[2]

### *The Board Hires Ms. Wiley*

21.     In 2016, Ms. Wiley applied and interviewed for the Ethics Officer (advertised as "Chief Integrity Officer") position. Ms. Wiley was one of two finalists for the position.

22.     However, the position was given to the other finalist, Stacey Kalberman, a white woman, who was confirmed by DeKalb's governing authority on March 8, 2016.

23.     Ms. Kalberman had spent most of her career in the field of insurance law, had no local government experience, had never tried a case while practicing law, and admitted to having no working knowledge of either the Georgia Civil Practice Act or the Georgia Rules of Evidence.

---

[2] There was a subsequent amendment in 2020 of the Ethics legislation, but that amendment did not change the Board's general authority to hire staff, including Ms. Wiley's position as Deputy Ethics Officer.

24.     In or around November 2016, Ms. Kalberman asked that the Board allow her to "hire an attorney to assist" with managing the varied needs of the Ethics Office, which included the bringing and trying of charges of ethics violations against County employees.

25.     Consistent with the general hiring authority the Board held since 1990 and as expanded in the 2015 Ethics legislation, the Board authorized Kalberman to hire an attorney to assist in prosecuting ethics cases.

26.     The Board instructed Ms. Kalberman to present candidates for the proposed new attorney position, but ultimately rejected the candidates she put forward.

27.     Instead, the Board instructed Ms. Kalberman to contact Ms. Wiley about her interest in and availability for the job, since she had proven to be a well-qualified candidate based on her credentials and interviews with the Board for the Ethics Officer position.

28.     Ms. Wiley was hired as the Deputy Ethics Officer on April 17, 2017, and the Board formally welcomed her to the position during its April 20, 2017, public meeting.

29.     Defendant DeKalb County separately approved the hiring of Ms. Wiley by, among other things, funding the position of Deputy Ethics Officer and performing all of the traditional functions to allow for Ms. Wiley's position.

### *Ms. Kalberman Exhibits Signs of Racial Bias to Ms. Wiley in Day-to-Day Interactions and in the Prosecution of Ethics Cases*

30.     Almost immediately after Ms. Wiley started her job, she experienced the first of many incidents of Ms. Kalberman making or allowing racially-charged or overtly racist statements in Ms. Wiley's presence.

30.     During the first week of Ms. Wiley's employment as Deputy Ethics Officer in April 2017, Ms. Kalberman introduced Ms. Wiley to a male friend, who made disparaging comments about Black officials with the City of Atlanta, stating, "Those people always want something for nothing. Handouts." Ms. Wiley was disturbed by such a casually racist comment, but Ms. Kalberman was unmoved and continued conversing with her friend.

31.     A few months later, when Ms. Wiley and Ms. Kalberman were casually discussing the fatal shooting of a Georgia Tech student by campus police, Ms. Kalberman said, "I don't understand why they shot him. The 911 caller said he was blond." Ms. Wiley asked Ms. Kalberman to explain this comment, and Ms. Kalberman retorted, "But they said he was blond! *He was blond!*," implying that,

because the student was white, his life should have been spared. Ms. Wiley, who had a Black son attending college at that time, was disturbed by Kalberman's comments.

32.     Ms. Kalberman also routinely made or affirmed comments premised on racist tropes about the intellect of Black people, and particularly Black women, to Ms. Wiley and in the presence of Ms. Wiley—herself a Black woman. Examples included:

   a. While Ms. Wiley and Ms. Kalberman watched news coverage of DeKalb citizens —Black and white— expressing opposing views on an upcoming referendum regarding Board of Ethics legislation, Ms. Kalberman openly and derisively asked, "What does *she* know about ethics?" when a Black woman wearing an NAACP shirt was interviewed. However, Ms. Kalberman had not questioned or disparaged the white woman who was interviewed. Ms. Wiley asked Ms. Kalberman if she personally knew either of these women, Ms. Kalberman responded "No."

   b. When Ms. Wiley suggested that Ms. Kalberman meet with a Black female State Representative to discuss legislative changes to the Ethics legislation Ms. Kalberman refused and said, "She won't understand." Instead, Ms. Kalberman chose to deal exclusively with white female

State Representatives and expressed no reservation about their intellectual capacity.

c. When a Black female was appointed to the Ethics Board in 2021, Ms. Kalberman would only reference her as "the lady from the NAACP" or "NAACP lady." Ms. Kalberman openly questioned this person's mental capacity, stating, "I'm afraid she won't understand [the Board's work]." When Ms. Wiley asked if Ms. Kalberman personally knew this individual, Ms. Kalberman answered "No."

d. Ms. Kalberman mocked the intelligence of a former Judge of the DeKalb County Superior Court--a Black female. During a conference call with Ms. Kalberman and Ms. Wiley, this vendor referred to the Judge as a "token" nominee to a State appellate court. When Ms. Wiley objected to these racially offensive comments, Ms. Kalberman accused Ms. Wiley of "overreacting" and "misreading" the situation. When Ms. Wiley disagreed, Ms. Kalberman made it clear that she was "not going to change" vendors.

e. Ms. Kalberman disparaged the intelligence of the County Human Resources Director – a Black female who holds a Master's degree and has more than 20+ years of experience in her field. When Ms. Wiley

complimented the thoroughness of correspondence written by the Director, Ms. Kalberman retorted, "She probably didn't write that. She can't write like that."

f.   In May 2021, Ms. Kalberman mocked the County CEO's manner of speaking. The CEO--a Black male--is an attorney, an author, and skilled orator. Following a public meeting where the CEO colloquially stated, "My mama didn't raise no thief," in response to a news report about certain public contracts, Ms. Wiley subsequently spoke to Ms. Kalberman via phone. Ms. Kalberman repeated the CEO's comment in a derogatory "Black voice" and said, "That might work in *his* segment of the population, but it won't work here."

33.    In addition to making discriminatory comments—Ms. Kalberman allowed the Ethics Office's white administrative support employee to mistreat Ms. Wiley for months without taking action when Ms. Wiley reported the employee.

34.    Although this employee was subordinate to Ms. Wiley, she would refuse to do the most basic administrative tasks Ms. Wiley requested of her, such as ordering office supplies, updating equipment, processing payment for professional dues, arranging work-related travel and other basic administrative functions while performing those tasks for Ms. Kalberman without objection.

35.     However, despite Ms. Wiley's requests for assistance and intervention, Ms. Kalberman refused to discipline this employee for her conduct; as a result, the employee became even more emboldened in her slights towards Ms. Wiley.

36.     Ms. Wiley later overheard a conversation between this employee and Ms. Kalberman discussing how a police officer would have been justified in using deadly force against a group of young Black children engaged in a childish prank of using a water hose to spray water on the officer.

37.     Additionally, Ms. Kalberman's racial bias became apparent in the manner in which she chose to pursue ethics cases against Black employees much more frequently than white employees who may have engaged in similar misconduct.

### *Ms. Kalberman Tells Ms. Wiley To "Go To HR" for Employment Grievances and Ms. Wiley Drafts an EEO Policy Consistent With That Directive*

38.     Ms. Wiley attempted to talk to Ms. Kalberman about her concerns over Ms. Kalberman's racial bias throughout early 2021, but these discussions often proved futile.

39.     On August 2, 2021, in response to ongoing equity concerns raised by Ms. Wiley, Ms. Kalberman quipped that if Ms. Wiley had "concerns about the way you have been treated by me or anyone else in DeKalb, please use [DeKalb County] HR as a resource to address your concerns."

40.    The Ethics Board did not have its own Human Resources department at any time relevant to the complaint nor any prescribed process that informed staff how and where to file a complaint of discrimination and retaliation based on race or other legally protected classes.

41.    The County's Human Resources department exclusively handled all the traditional personnel transactions for Ethics Office staff.

42.    The absence of a separate grievance procedure for employees of the Ethics Board was an issue Ms. Wiley raised with Ms. Kalberman specifically on July 26, 2021.

43.    Because there was no grievance procedure, Ms. Wiley stated that she would draft one for the Board's consideration at the August 19th public meeting and would provide an advance draft to Ms. Kalberman and Board counsel for their review and approval.

44.    Ms. Kalberman replied to Ms. Wiley, "I think it's a good idea to establish an EEO policy for the Ethics Office and I look forward to receiving your draft of the policy."

45.    Ms. Wiley drafted a standard anti-harassment and anti-discrimination policy for the Board aligned with federal anti-discrimination laws, with three possible avenues for handling reports of EEO policy violations arising thereunder:

using the County's Human Resources department for investigation (as suggested by Kalberman) on the Board's behalf; having the Board retain and investigate such complaints; or hiring an independent attorney specializing in such matters to conduct such investigations.

46.    On August 16, 2021, Ms. Wiley circulated a draft of the EEO policy to Ms. Kalberman and Board counsel, requesting edits, comments, and questions. She also advised that she was waiting for the County Human Resources department to receive approval from the County CEO to handle investigative responsibilities into violations of the EEO policy within the Ethics office.

47.    Ms. Kalberman responded on August 17, 2021, advising that she had reviewed the policy multiple times, asked a question about some of the language in the policy, and suggested a substantive revision to part of the policy. She also thanked Ms. Wiley for preparing the policy.

48.    That same day, Ms. Wiley requested to add consideration of the new EEO grievance policy/procedure to the agenda for the Board's forthcoming August 19, 2021 meeting. Ms. Kalberman confirmed that it would be added to the agenda.

49.    On August 18, 2021, Janet Essix, Employee Relations Manager for the County, emailed Ms. Wiley and advised that HR would agree to "be a resource for the Ethics Office," and that DeKalb County Human Resources reserved the right to

recommend an outside attorney to review any EEO complaints against the Ethics Board.

50.     That same day, Ms. Wiley circulated the draft EEO policy to the Board's members in anticipation of the Board's consideration at the August 19 public meeting.

51.     The Board unanimously voted 5-0 to adopt the EEO policy.

52.     The EEO policy's reporting procedure requires that an EEO complaint against the Ethics Officer or Deputy Ethics Officer, be reported to the Chair and Vice-Chair. The Chair and Vice-Chair must then notify the full Board and forward the complaint to the County's Human Resources department for investigation. The Human Resources Director has the option of assigning the complaint to an outside attorney for investigation. Once the investigation is concluded, the findings are provided to the Ethics Board for final disposition.

***Ms. Wiley Submits a Complaint to the Board about Ms. Kalberman's Conduct***

53.     On September 21, 2021, Ms. Wiley verbally reported a claim of race discrimination and disparate treatment against Ms. Kalberman during a Zoom video conference with Defendant Lonnie Edwards, Sr. and then Ethics Board Vice-Chair Defendant David Moskowitz.

54.     Ms. Wiley explained during this call the racially offensive history she had experienced while working with Ms. Kalberman, including her repeated comments that Black people – especially Black women – were intellectually inferior, the racially disparate manner in which she chose to pursue (or not pursue) ethics investigations involving similar misconduct, and the explosive manner in which she spoke to Ms. Wiley when trying to discuss these sensitive issues.

55.     On that call, Defendants Edwards and Moskowitz asked for Ms. Wiley to give them time so they could "give the matter some thought." They promised, however, to follow up with Ms. Wiley by the first week of October 2021.

56.     Defendant Edwards called Ms. Wiley on October 15, 2021, and told her that he and Defendant Moskowitz had decided to keep the matter "in-house" and suggested they conduct an informal mediation with Ms. Wiley and Ms. Kalberman. Trusting that her complaint was being taken seriously and properly handled, Ms. Wiley agreed to Defendant Edwards' suggestion.

57.     On October 16, 2021, Defendant Edwards asked Ms. Wiley to provide a formal written statement of her complaint, which would be provided to Ms. Kalberman.

58.     In an email the following day, Defendant Edwards stated, "This matter is time sensitive and must be resolved as soon as possible."

59.    On October 19, 2021, Defendant Moskowitz contacted Ms. Wiley and instructed her to provide her written statement "promptly," so they could address her complaints.

60.    As directed, Ms. Wiley submitted a written complaint to Defendant Edwards and Defendant Moskowitz on October 22, 2021, alleging racial discrimination against Ms. Kalberman.

61.    Neither Defendant Edwards nor Defendant Moskowitz acknowledged receipt of Ms. Wiley's written complaint.

62.    Ms. Wiley contacted Defendants Edwards and Moskowitz by email on November 8, 2021, asking about the status of her complaint as she had heard nothing from either of them.

63.    Defendant Edwards responded and advised that they had spoken to Ms. Kalberman and given her until "sometime in December" to respond to Ms. Wiley's complaint, but they would not address Ms. Wiley's concerns until after that time.

64.    Ms. Wiley responded that she was not comfortable waiting another four to six weeks to have her concerns addressed, especially since nearly fifty days had already elapsed since she first made her verbal complaint in September. She also pointed out that Defendants Edwards and Moskowitz had both emphasized that her

grievance needed to be addressed promptly and she relied on that assurance when agreeing to "informal mediation."

65.   Ms. Wiley continued to work for Ms. Kalberman while her EEO complaint was pending, and she had some concern that Ms. Kalberman would retaliate against her for making the complaint the longer this matter went unaddressed.

66.   Based on these concerns, Ms. Wiley asked that her complaint be processed in accordance with the Board's recently adopted EEO Policy, stating, "If we are unable to informally discuss this matter until sometime in December, I would ask that we move to the more formal process of having my workplace bias concerns referred to Human Resources for investigating and handling."

67.   Neither Defendant Edwards nor Defendant Moskowitz responded to Ms. Wiley's request for County HR involvement.

### *Ms. Kalberman Retaliates Against Ms. Wiley and the Board Ignores Her Repeated Requests To Commence An Investigation of Her Complaint*

68.   As Ms. Wiley feared, Ms. Kalberman began interfering with her ability to perform her job functions following the filing of her internal grievance.

69.   In early November 2021, Ms. Kalberman began excluding Ms. Wiley from participating in meetings she usually attended, withholding key information about cases Ms. Wiley had been involved in for years, thwarting Ms. Wiley's

approved projects; and refusing to allow Ms. Wiley's to include items on Board meeting agendas for months in a row.

70.   Ms. Wiley reported this retaliation to Defendant Edwards and Defendant Moskowitz on December 13, 2021 and January 18, 2022, and both times, she reiterated her request for her complaint to be sent to HR to initiate an investigation.

71.   Neither Defendant Edwards nor Defendant Moskowitz acknowledged receipt of Ms. Wiley's reports of retaliation or her request for HR involvement.

72.   On February 3, 2022, Ms. Kalberman announced that she was resigning from her position as Ethics Officer, effective February 18, 2022.

73.   On February 4, 2022, Ms. Wiley asked Defendant Edwards and Defendant Moskowitz if she could address the Board during the closed-door session of the Board's upcoming February 17, 2022 meeting. This meeting would be the last time the Board could address Ms. Wiley's complaints against Ms. Kalberman while Ms. Kalberman still served as Ethics Officer.

74.   On February 8, 2022, Defendant Edwards called Ms. Wiley and denied her request to address her EEO complaint directly the full Board, telling her, "They know everything."

75.     During this call, Defendant Edwards repeatedly made baseless claims regarding Ms. Wiley's position and its legality in an attempt to intimidate her. Examples of statements he made to Ms. Wiley include, but are not limited to stating:

- Her job "did not exist," and that "There is no Deputy Ethics Officer;"

- He had spoken to Ms. Kalberman about Ms. Wiley's "illegal position;"

- He and Defendant Moskowitz had disclosed Ms. Wiley's EEO complaint with a State Senator, who told them not to send Ms. Wiley's complaints to HR, because Ms. Wiley should "go to the EEOC," and suggested that Dr. Edwards "get rid of her;" and

- He had to "follow the direction of the Senator, since he appointed me."

76.     Other than the limited role of appointing persons to serve on the Ethics Board in the event of a vacancy, the Ethics legislation gives no ongoing role or oversight responsibility for state legislators in any function of the Ethics Board or Ethics Office staff.

77.     Defendant Edwards' claim that Ms. Wiley's position "did not exist" is contrary to the Ethics legislation. Law. Sec. 22A(h)(4).[3]  Indeed, during that call,

---

[3] "The board of ethics shall be authorized to employ its own staff and clerical personnel and contract for the services of a competent court reporter, an attorney, and a private investigator as it deems necessary." *Id.*

21

Ms. Wiley had Edwards pull up this provision and read it aloud along *with* him; however, Edwards remain undeterred in his threat.

78.     February 8, 2021, was the first time anyone had suggested to Ms. Wiley that her position was "illegal."

79.     This legally unsound, arbitrary, and sudden threat to end Ms. Wiley's employment by Defendant Edwards reflected an attempt to intimidate Ms. Wiley into not following up on her discrimination and retaliation claims.

80.     Indeed, Defendant Edwards disclosed to Ms. Wiley that once she requested that her complaint be forwarded to HR for investigation, he was "through" with Ms. Wiley and her pending EEO complaint.

81.     Following the disturbing call, Ms. Wiley made a retaliation complaint against Defendant Edwards, Defendant Moskowitz, and Ms. Kalberman, which she submitted to the full Board on February 10, 2022.

82.     This complaint detailed how Defendants Edwards and Moskowitz had mishandled her EEO complaint and the additional information that these Defendants, along with Ms. Kalberman, were manufacturing a scheme to terminate Ms. Wiley's employment on the false theory that her position was illegal and "did not exist." She asked the Board to protect her from any further retaliation by

Defendants Edwards and Moskowitz. She also asked to address the Board directly about these serious matters during the February 17, 2022 meeting.

83.     Ms. Wiley's request to address the Board was denied.

84.     However, Defendant Edwards and Defendant Moskowitz met with the Board in a closed session for over two hours on that date.

85.     On March 10, 2022, Ms. Wiley again asked to address the Board about her still-pending complaints during its March 17, 2022, meeting.

86.     Defendant Moskowitz denied her request.

87.     During the March 17, 2022 meeting, Ms. Wiley was able to discuss how Ms. Kalberman had violated the Ethics Code and implemented regulations to garner the dismissal of the two (2) ethics complaints against county officials (who happened to be white).  Ms. Wiley also disclosed that Kalberman's actions were unprecedented and illegal.  Ms. Wiley offered a process that would allow the Board to dispose of these complaints in a lawful manner.

88.     Defendant Moskowitz began publicly berating and chiding Ms. Wiley for Kalberman's misconduct and threatened to place Ms. Wiley under investigation even though Ms. Wiley had nothing to do with Kalberman's actions.

89.     Following the March 17, 2022, public beratement by Defendant Moskowitz, Ms. Wiley again requested that the Board forward her complaint to Human Resources.

90.     On April 4, 2022, Ms. Wiley learned after-the-fact that Board member Candice Rodgers had mailed Ms. Wiley's complaints to HR on March 8, 2022.

91.     Along with Ms. Wiley's complaints, Ms. Rodgers sent Human Resources an inflammatory letter accusing Ms. Wiley of acting improperly and unethically because she had drafted the EEO policy and then complained under it.

92.     The Board never advised Ms. Wiley at the time it approved the EEO policy—a time when there were only three employees housed in the Ethics office, including Ethics Officer Kalberman, Ms. Wiley, and their assistant—that Ms. Wiley would not be able to avail herself of this policy because she drafted it.

93.     The Board also never advised Ms. Wiley of any alternative to the EEO policy it adopted for other employees of the EEO office that she could use if she believed she was subjected to unlawful race discrimination.

94.     Ms. Rodgers' letter also falsely accused Ms. Wiley of "colluding with HR" in order to obtain a favorable resolution of her complaints.

95.     Thus, the Board reprimanded Ms. Wiley for using the Ethics Board's EEO policy because she drafted it, and then levied accusations against her when she

attempted to use the only available alternative—County Human Resources—to seek redress for her race discrimination complaint.

96.     In fact, it was Ms. Kalberman, not Ms. Wiley, who suggested having Human Resources review complaints made pursuant to the EEO policy.

97.      Ms. Wiley had only communicated with the HR Director by phone on a few occasions and had only met her in person once during her five-and-a-half-year tenure with the Board.

98.     Consistent with the EEO policy, the letter asked HR to recommend that the Board hire outside counsel to investigate Ms. Wiley's claims.

99.     On April 4, 2022, the County Attorney responded to Ms. Rodgers' March 8 letter recommending that the Board hire an outside attorney to investigate Ms. Wiley's claims as required by law.

100.   Fourteen (14) days later, Ms. Wiley was suspended with pay.

101.   On April 7, 2022, Lonnie Edwards abruptly resigned from the Board.

102.   When Edwards resigned, the position of Chairman was legally vacated. The Ethics legislation requires the Board operate with a duly elected Chairman. The Board's duly adopted Parliamentary Rules provide that in the event of a vacancy in this important office, a new Chair must be elected. The Vice-Chair does not automatically ascend to the position when there is a legal vacancy.

103.   On April 11, 2022, Ms. Wiley explained to Defendant Moskowitz that the law required the Board Chair to be elected after Moskowitz publicly announced that he was automatically assuming the chairmanship. Moskowitz ignored Ms. Wiley's report of a violation of law and assumed the chairmanship anyway.

104.   The next week, Defendant Moskowitz—himself implicated in Ms. Wiley's complaints—set a special Board meeting on April 18, 2022 for the express purpose of discussing Ms. Wiley's complaints, despite the fact that a regular Board meeting was already scheduled for April 21, 2022.

105.   Defendant Moskowitz provided no notice to Ms. Wiley of the scheduling of this meeting.  Further, the public notice for the meeting contained the wrong date.

106.   Defendant Moskowitz presided over the April 18 meeting.

107.   A legal quorum consists of 4 regular Board members. Board Parliamentary Rules at the time required the Chairman to designate an alternate member to serve in order to maintain a legal quorum—which must be done in public.

108.   When the Board convened the closed executive session, Moskowitz did not attend, leaving the Board too few attendees to constitute a legal quorum to conduct business.

109.   Nevertheless, when the Board reconvened following the closed session, Defendant Moskowitz announced that the Board had "resolved a personnel issue." Ms. Rodgers confirmed that "the personnel issue had been concluded."

110.   Then, on April 19, 2022, Ms. Wiley received an email from then Alternate Board member Alexandra Joseph advising that she had been placed on administrative leave with pay, allegedly pending the investigation of her complaints.

111.   Ms. Wiley received no notice or warning of this suspension.

112.   As part of her placement on administrative leave, Ms. Wiley was denied direct access to her County email address and computer and was not able to access many of the documents supporting her claims.

113.   Per Ms. Joseph's email, Ms. Wiley contacted Board member Candace Rodgers regarding the reason for her placement on administrative leave.

114.   Ms. Rodgers responded on April 20, 2022, telling Ms. Wiley to "refer to the reasons specifically stated in the notice" from Ms. Joseph, and advising that the Board would contact her about the assignment of outside counsel to investigate her claims. Alternate Board member Bill Clark sent an email urging Ms. Rodgers to not say anything further to Ms. Wiley about the matter.

115.   On April 26, 2022, Ms. Wiley again contacted the Board by email asking to return to work. She advised that because she had been so abruptly removed

from work and from her access to her County email, she had been forced to miss part of a three-day ethics seminar paid for with taxpayer dollars. She had also been unable to fulfill obligations she had made in connection with pending Board business, including ethics violations cases, financial disclosures for the County, and an ethical culture survey the Ethics Office had been working on rolling out for months.

116.   Ms. Wiley did not receive a response.  She heard nothing further from the Board for over a month about the status of any investigation.

117.   The Board never placed Ms. Kalberman on administrative leave at any time after Ms. Wiley filed an internal grievance and a period of several months lapsed between Ms. Wiley's filing of her internal grievance and the end of Ms. Kalberman's term.

### *Ms. Wiley files an EEOC Charge and the Ethics Board initiates an investigation*

118.   On May 25, 2022, Ms. Wiley filed a Charge of discrimination and retaliation against the Board with the EEOC.

119.   On May 27, 2022, Ms. Wiley received an email from Bonnie Levine, an attorney hired by the Board to serve as its general counsel. Ms. Levine advised that the Board had retained outside counsel to investigation Ms. Wiley's complaints, and that the investigator would contact Ms. Wiley to set an interview with her.

120.   In communications with Ms. Wiley, the investigator advised that she had been tasked with investigating Ms. Wiley's October 22, 2021 discrimination complaint and her February 10, 2022 retaliation complaint.

121.   Ms. Wiley's first interview with the investigator took place on June 7, 2022.

122.   However, from the start of the interview, it was clear that the investigator appeared to treat Ms. Wiley as though *she* were under investigation.

123.   For example, the investigator opened the interview by giving Ms. Wiley a *Garrity* warning, which is given to public employees when they are under investigation for allegations involving potential criminal acts.

124.   This warning, coined by the U.S. Supreme Court in a case titled *Garrity v. New Jersey*, 385 U.S. 493 (1967), is a legal warning issued by investigators in employment matters to provide notice to employees of their right to be free from compulsory self-incrimination.

125.   There was no legitimate reason for the interviewer to issue a *Garrity* warning to an employee who filed an internal grievance of race discrimination unless Defendants' intention was to use the investigation of Ms. Wiley's grievance to evaluate Ms. Wiley's conduct for potential criminal wrongdoing.

126.   When Ms. Wiley asked why the investigator had issued a *Garrity* warning, the investigator said she was "covering all [her] bases."

127.   The investigator then told Ms. Wiley that everything pertaining to the investigation, including the investigator's notes, was protected by "attorney-client privilege," implying that she represented both Ms. Wiley and the Board.

128.   When Ms. Wiley inquired whether the investigator was representing the Board, the investigator said no, and again said she was "covering [her] bases."

129.   The investigator's blatant misuse of both a *Garrity* warning and the attorney-client privilege immediately raised questions regarding the training and bias of the investigator to conduct the investigation into Ms. Wiley's claims, that she viewed Ms. Wiley as though she were under investigation, and that she had an inappropriate view of her supposedly independent relationship with the Board.

130.   At the conclusion of the interview, the investigator indicated that due to her own busy schedule, she did not expect to be able to complete the investigation in the near future, as she intended to interview five to six other witnesses.

131.   The interview lasted a total of 90 minutes, but Ms. Wiley was not able to go into as much detail as she needed in order to fully support her claims because Ms. Wiley did not have access or searchability of her work emails in order to provide the investigator what she needed.

132.   Ms. Wiley contacted the Ethics Board's attorney about accessing her email account, explaining that she had difficulty recounting specific details and dates without having access to refresh her memory with the records of the events in question.

133.   Ms. Wiley made Open Records Act requests to obtain access to her own emails.  Defendants' response was to produce responsive documents in a .pst file format that Ms. Wiley had technical trouble accessing.  When Ms. Wiley asked for the requested documents in other formats because the .pst format was not compatible or accessible to her, Defendants refused to produce the documents in any other format including paper records at Ms. Wiley's expense or portable document format (.pdf).

134.   Ms. Wiley also advised the Ethics Board's counsel that because she was denied access to her County email account, she had nearly missed the reenrollment period for her health insurance benefits, and that the lack of access to her emails was causing problems beyond impairing her ability to participate in the investigation.

135.   The Ethics Board's counsel suggested that Ms. Wiley "describe any particular correspondence to the investigator as best you can recall and the investigator can also request copies from me."

136.   This solution was inadequate, however, because Ms. Wiley could not possibly simply "recall" emails from months, or years, prior without having access to apply search terms or other tools to review for all possible relevant information.

137.   On June 8, 2022, Ms. Wiley retained the undersigned counsel.

138.   Plaintiff's counsel contacted the investigator regarding a follow-up interview, and expressed concerns about the manner in which the prior interview was conducted, including the unnecessary and thoughtless *Garrity* warning.

139.   Plaintiff also clarified whether the *Garrity* warning was issued because *she* was under investigation for her own wrongdoing, and counsel for the Ethics Board denied vehemently that this was the case.

140.   The investigator, after stating unequivocally that Ms. Wiley was not under investigation, stated that if Ms. Wiley was willing to "forego" her rights under *Garrity*, then she would retract the warning.

141.   Ms. Wiley refused to "forego" her rights under *Garrity*, explained why she should not be required to do so as a condition of participating in the investigation, and again asked that the investigator retract the *Garrity* warning.

142.   Ultimately, and only after Ms. Wiley retained legal counsel, did the Defendants retract the *Garrity* warning that should not have been issued to her in the first place.

143.   On July 7, 2022, Ms. Wiley, her counsel, and the investigator reconvened for a second interview concerning Ms. Wiley's complaints.

144.   In the course of questioning, the investigator asked open ended questions requiring Ms. Wiley to recount, for example, "every instance" of an allegation over a several-year period of time.

145.   The investigator kept pressing Ms. Wiley to provide exact dates for every interaction or event she described, and when Ms. Wiley advised that she could not recall those dates without having access to her work emails, the investigator indicated she "had nothing to do with that."

146.   At one point, the investigator raised her voice and stated, "I get it, you want your emails!"

147.   The interview ended before Ms. Wiley had even reached the point of her narrative when she made her complaint to Defendant Moskowitz and Defendant Edwards in October 2022—and well before the events leading to Ms. Wiley's retaliation complaint had occurred due to the lack of emails.

148.   The investigator agreed that she had a number of questions left to ask Ms. Wiley about her complaints and agreed to reconvene for a third interview in the near future.

149.   Following the failed July 7 interview, Ms. Wiley's counsel again reached out to the Ethics Board's attorney about obtaining Ms. Wiley's emails.

150.   Board counsel ultimately sent a .pst file of the entire contents of Ms. Wiley's email account.

151.   Ms. Wiley was unable to access the .pst file, and the file was too large for Plaintiff's counsel to download, too.

152.   Ms. Wiley's counsel requested that the Ethics Board provide the files in another format or that they send the contents on an external hard drive so counsel could access the files, but the Board never responded to this request.

153.   Neither Ms. Wiley nor her counsel was ever able to access her emails or provide relevant evidence to the investigator in support of Ms. Wiley's complaints.

### *The investigator issues her findings without Ms. Wiley's outstanding evidence or interviewing Lonnie Edwards and the Board accepts it*

154.   On August 22, 2022, the Ethics Board's counsel transmitted the investigator's final report on Ms. Wiley's complaints, concluding that they were meritless.

155.   The investigator had never even attempted to reschedule the third interview before issuing the report, meaning that she had never discussed Ms. Wiley's retaliation complaint with her before concluding it was meritless.

156.   In a footnote, the investigator stated that "the discontinuance of the second interview did not impede the Investigator's ability to make findings of fact because the Investigator had full access to Ms. Wiley's highly detailed written complaints." The investigator never asked Ms. Wiley a single question about her retaliation complaint.

157.   The investigator had also failed to interview Defendant Edwards, a key subject of Ms. Wiley's February 10, 2022 retaliation complaint, before concluding that allegation was "meritless."

158.   In another footnote, the investigator stated that Defendant Edwards' non-responsiveness to interview requests "did not impede the investigation as information gathered from other Board members and documentation was sufficient to make findings of fact."

159.   None of the other Board members were party to the February 8, 2022 phone call that was a major factor in Ms. Wiley's retaliation complaint.

160.   The only individuals privy to the February 8th phone conversation were Ms. Wiley and Defendant Edwards; having Ms. Wiley's allegations of his retaliation and no response from Defendant Edwards, the investigator still found in favor of the Board exclusively based on conversations with individuals who were not even privy to that conversation.

161.   The bulk of the "evidence" the investigator relied on in her report were third party Board members' observations that Ms. Wiley had worked "in a professional manner" with Ms. Kalberman, Defendant Moskowitz, and Defendant Edwards, despite her complaints about them.

162.   The investigator wrongly and inappropriately conflated Ms. Wiley's commitment to professionalism with evidence that her complaints were meritless.

163.   Counsel for Ms. Wiley complained on Ms. Wiley's behalf to counsel for the Ethics Board that the investigation appeared to ignore key evidence, in violation of Ms. Wiley's federal rights.

164.   Counsel for the Ethics Board responded that the Board had found the investigator's conclusions "worthy of acceptance," but also indicated that the Board had decided to close the investigation because it could not "justify additional delay, resources, and expenditure on evidence gathering at this point"—all but admitting that the investigation had been incomplete.

165.   Startlingly, despite the issuance of the investigator's report, the Board still refused to allow Ms. Wiley to return to her job, and continued to keep her on paid administrative leave, despite her requests to return to work and despite the conclusion of the pending investigation.

166. Ms. Wiley began to experience severe distress and anxiety about the Board's treatment of her.

### *The Board makes its final act of retaliation by terminating Ms. Wiley*

167. In January 2023, after months of refusing to allow Ms. Wiley to return to work without a legitimate reason, the Board announced that it intended to vote on whether to allow the Deputy Ethics Officer position to exist at all.

168. Based on Defendant Edwards' baseless statements that Ms. Wiley's job was "illegal" from approximately one year earlier, the Board placed an item on their January 19, 2023 meeting agenda to consider whether to abolish the position.

169. On January 19, 2023, the Board convened for a vote on whether to eliminate Ms. Wiley's position and terminate her employment. Defendant Moskowitz echoed the false and retaliatory comment that Ms. Wiley's position "did not exist" (even though the same Board had been funding it for years.) The vote passed, and Ms. Wiley was discharged from her employment with the County and the Board.

### COUNT I
### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981
(Against All Defendants)

170. Plaintiff incorporates by reference paragraphs 1 through 169 of the Complaint as if fully restated herein.

171.  As a Black woman, LaTonya Wiley was in a class of employees protected by 42 U.S.C. § 1981.

172.  Plaintiff was a party to an employment agreement with Defendants Board and County in that she performed work for these entities and they compensated her for her work.

173.  Defendants Edwards and Moskowitz are individually liable under Section 1981 because they were in a position to affect the terms and conditions of Ms. Wiley's employment, and personally undertook action that interfered or diminished her rights under 42 U.S.C. § 1981, including, but not limited to, mishandling the investigation of her internal grievance and fabricating pretextual reasons to eliminate her position.

174.  Defendants violated 42 U.S.C. § 1981 by taking adverse employment action against Plaintiff because of her race, including but not limited to: subjecting Ms. Wiley to a work environment with a supervisor who repeatedly and on several occasions exhibited racial bias against Black people, denying Ms. Wiley the use of any internal grievance procedures—through either the Ethics Board or County— even though the Board had just adopted an internal grievance procedure for use by other Ethics Board employees; placing Ms. Wiley on administrative leave without any allegation of wrongdoing; subjecting Ms. Wiley to a sham investigation of her

claims where she was not fully interviewed and one of her accused discriminating parties was not interviewed, and she was prevented from accessing documents to support her claims; and terminating Ms. Wiley's employment. Defendants acted with malice and in reckless indifference to Ms. Wiley's federally protected rights.

175.   Defendants have willfully and wantonly disregarded Ms. Wiley's rights, and Defendants' discrimination against Ms. Wiley was undertaken in bad faith.

176.   The effect of the conduct was to deprive Ms. Wiley of equal employment opportunity, and otherwise adversely affect her status as an employee and/or the terms and conditions of her employment because of her race.

177.   As a direct and proximate result of these actions, Ms. Wiley has been made a victim of acts that adversely affected her psychological and physical well-being, as well as causing lost compensation and benefits.

178.   Pursuant to 42 U.S.C. § 1981, Ms. Wiley is entitled to damages, including but not limited to back pay and lost benefits, compensatory damages, punitive damages, reinstatement, equitable relief, attorneys' fees, costs of litigation, and all other relief recoverable under 42 U.S.C. § 1981.

**COUNT II**
**RETALIATION IN VIOLATION OF 42 U.S.C. § 1981**
(Against All Defendants)

179.   Plaintiff incorporates by reference paragraphs 1 through 169 of the Complaint as if fully restated herein.

180.   Ms. Wiley engaged in legally protected activity when she reported her supervisor, Stacey Kalberman's, frequent use of racially biased comments to describe other DeKalb County employees (including leaders) and individuals in the community, which reflected baseless biases and racial stereotypes that Black people were unintelligent, unable to comprehend ethical issues, and crime-prone.  These biases not only tainted Ms. Kalberman's treatment of Ms. Wiley as an employee (including openly making racist comments in her presence) but impacted Kalberman's selection of ethics cases to prosecute.  Ms. Wiley submitted internal complaints on October 22, 2021 and February 10, 2022 to then Board-Chair Lonnie Edwards and Vice-Chair Moskovitz.

181.   Ms. Wiley filed an EEOC Charge against the DeKalb Board of Ethics on May 25, 2022, to which the Ethics Board responded on August 12, 2022.

182.   Ms. Wiley separately filed an EEOC Charge against Defendant DeKalb County, to which the County filed a Position Statement in response on September 14, 2022.

183.   Defendants retaliated against Ms. Wiley in violation of 42 U.S.C. § 1981 by taking adverse employment action against Plaintiff because of her protected activity complaining of race discrimination and retaliation, including but not limited to: accusing Ms. Wiley of unethical conduct for filing an internal grievance and contacting DeKalb County Human Resources about her concerns, berating Ms. Wiley for filing a grievance and threatening her job, placing Ms. Wiley on administrative leave for approximately nine months without an allegation of wrongdoing against her, delaying investigation of Ms. Wiley's internal grievance for approximately seven months, ultimately performing a sham investigation without thoroughly interviewing Ms. Wiley and other key witnesses or working with Ms. Wiley to allow her access to her emails, and terminating her employment for pretextual reasons related to the legality of her position that Defendants never raised prior to her protected activity.

184.   Defendants have willfully and wantonly disregarded Ms. Wiley's rights, and Defendants' actions were undertaken in bad faith.

185.   The effect of the conduct was to deprive Ms. Wiley of equal employment opportunity on the basis of race, and otherwise adversely affect her status as an employee and/or the terms and conditions of her employment because she engaged in legally protected activity complaining of conduct that violated 42

U.S.C. § 1981.

186.   As a direct and proximate result of these actions, Ms. Wiley has been made a victim of acts that adversely affected hers psychological and physical well-being, as well as causing lost compensation and benefits.

187.   Pursuant to 42 U.S.C. § 1981, Ms. Wiley is entitled to damages, including but not limited to back pay and lost benefits, compensatory damages, punitive damages, reinstatement, equitable relief, attorneys' fees, costs of litigation, and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT III
## RETALIATION IN VIOLATION OF THE GEORGIA
## WHISTLEBLOWER PROTECTION ACT ("GWA"),
## O.C.G.A. § 45-1-4(d)(2)
(Against Entity Defendants only)

188.   Ms. Wiley incorporates the allegations contained in Paragraphs 1 through 169 as if fully set forth herein.

189.   At all times relevant to this action, the County and the Board were Ms. Wiley's employers and each was a "public employer" as defined by O.C.G.A. § 45-1-4(a)(4).

190.   At all times relevant to this action, Ms. Wiley was a "public employee" as defined by O.C.G.A. § 45-1-4(a)(3).

191.   As described herein, Ms. Wiley disclosed violations of and/or

42

noncompliance with laws, rules, and/or regulations and/or fraud, waste, and abuse to the County within the meaning of O.C.G.A. § 45-1-4(d)(2) by Stacey Kalberman, David Moskowitz, and Lonnie Edwards, including but not limited to, the following: (1) filing internal complaints of race discrimination and retaliation as to the terms and conditions of her employment in violation of Title VII and 42 U.S.C. § 1981; (2) filing Charges of race discrimination and retaliation with the U.S. Equal Employment Opportunity Commission; (3) protesting the Defendants' failure to timely commence an investigation of her race discrimination and retaliation grievances on or about February 10, 2022 and March 21, 2022; (4) opposing racially disparate prosecution of ethics violations for the same alleged misconduct by individuals of different races; (5) protesting the absence of an internal grievance procedure for allegations of unlawful discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981 and other civil rights statutes; (6) participating as a witness in the investigation of her race discrimination and retaliation grievances; (7) opposing on or about April 11, 2022, legislative action by the Ethics Board without a legally elected Board Chair when Defendant Moskowitz assumed that role without being elected; and (8) protesting, on or about March 10 and 17, 2022, the unlawful issuance by the Ethics Board of Advisory Opinions for past conduct in violation of DeKalb Ord. Sec. 22A(b)(6) and Board Rule 2.3.

192.   The County and the Board retaliated against Ms. Wiley for engaging in protected conduct in violation of O.C.G.A. § 45-1-4(d)(2), including but not limited to: (1) failing to conduct a timely investigation of her race-related internal grievances; (2) berating her for filing a grievance and threatening her employment; (3) placing her on administrative leave for no legitimate reason and without any pending allegation of wrongdoing; (4) cutting off her access to her work and work email account so she may receive notice of employment benefits and other developments related to the terms and conditions of her employment as well as access the search feature of her email to produce evidence in support of her grievances; (5) conducting a sham investigation where the investigator failed to interview key witnesses, thoroughly interview Ms. Wiley about all her allegations, and facilitate Ms. Wiley's access to documents so she may produce supporting records; (6) failing to provide a clear grievance procedure to Ms. Wiley without fear of retaliation; (7) accusing her in writing of baseless ethical violations merely for utilizing a grievance procedure; and (8) terminating her employment for pretextual reasons.

193.   The County and Board's termination of Ms. Wiley in violation of the GWA has caused her to suffer lost compensation and benefits, other financial losses, damage to her professional reputation, and mental and emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a TRIAL BY JURY and the following

relief:

(a)    a declaratory judgment that the Defendants have engaged in unlawful

employment practices in violation of 42 U.S.C. § 1981;

(c)    an injunction prohibiting Defendants from engaging in unlawful

employment practices in violation of 42 U.S.C. § 1981;

(d)    full back pay from the date of Plaintiff's termination, taking into

account all raises to which Plaintiff would have been entitled but for

her unlawful termination, and all fringe and pension benefits of

employment, with prejudgment interest thereon;

(e)    reinstatement or in lieu thereof front pay to compensate Plaintiff for lost

future wages, benefits, and pension;

(f)    compensatory damages, in an amount to be determined by the

enlightened conscience of the jury, for Plaintiff's emotional distress,

suffering, inconvenience, mental anguish, loss of enjoyment of life and

special damages;

(g)    That Plaintiff recovers compensatory damages in an amount to be

determined by a jury;

(h)     That Plaintiff recovers her attorneys' fees and costs of litigation

pursuant O.C.G.A. § 45-1-4(f); and

(i)     Any and other such further monetary, non-monetary, and equitable

relief that this Court deems equitable and just.

Respectfully submitted this 7th day of February, 2023.

BUCKLEY BALA WILSON MEW LLP

/s/ *Anita K. Balasubramanian*
Anita K. Balasubramanian
Georgia Bar No. 372029
abala@bbwmlaw.com
Kathleen B. Kacynski
Georgia Bar No. 587883
kkacynski@bbwmlaw.com

600 Peachtree Street NE
Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101